Ensung CHOE–RIVELY, Plaintiff,

v.

VIETNAM VETERANS OF AMERICA CHAPTER 83, NEW CASTLE, COUNTY DELAWARE, INC., Vietnam Veterans of America, Inc., George E. Webb, Jr., Ned Sugzdinis, Terrence E. Baker, William Russo and Calvin Gross, Defendants.

and

Vietnam Veterans of America Chapter 83, New Castle County, Delaware, Inc., Third–Party Plaintiff,

v.

David Rively, Third–Party Defendant.

Nos. C.A. 99–336–GMS, C.A. 99–430–GMS.

United States District Court, D. Delaware.

March 19, 2001.

464

Gary W. Aber, Heiman, Aber, Goldlust & Baker, Wilmington, DE, for plaintiff and third party defendant.

Donald M. Ransom, Casarino, Christman & Shalk, Wilmington, DE, for defendant and third party plaintiff, Vietnam Veterans of America, Chapter 83, New Castle County, Delaware, Inc.

Robert K. Pearce, Truzskowski, Kipp, Kelleher & Pearce, Wilmington, Delaware, of counsel Michael J. Gaffney, Gaffney & Schember, P.C., Washington, DC, for defendants Vietnam Veterans of America, Inc., William Russo, and Calvin Gross.

Elwood T. Eveland, Jr., Hass & Eveland, Wilmington, DE, for defendants George E. Webb, Jr., Ned Sugzdinis, and Terrence E. Baker.

### MEMORANDUM OPINION

SLEET, District Judge.

## I. INTRODUCTION

On May 28, 1999, the plaintiff in this

case, Ensug Choe–Rively,[1] ("Choe–Rively") filed a complaint against Vietnam Veterans of America, Chapter 83, New Castle County Delaware, Inc. ("Chapter 83") and Vietnam Veterans of America, Inc. (the "VVA") (D.I.1).[2] Choe–Rively filed a separate suit on July 7, 1999 (99–430–GMS, D.I.1). Although the second action included several different parties and claims, the court consolidated the two cases on May 22, 2000. The parties have filed cross claims as well as amended complaints and answers.

The docket reveals the following parties, and the claims against them. First, Choe–Rively avers the VVA violated Section 16(b) of The Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Second, she alleges William Russo and Calvin Gross (with the VVA, the "VVA Defendants") violated 42 U.S.C. §§ 1981 and 1985(3). Third, she asserts Chapter 83 violated 29 U.S.C. § 216(b) and 42 U.S.C. § 1981. Finally, she contends George E. Webb, Jr., Ned Sugzdinis, and Tererence E. Baker violated 42 U.S.C. §§ 1981 and 1985(3). Chapter 83 has asserted a counter-claim against Choe–Rively alleging she overpaid her salary and diverted funds and property. Chapter 83 also filed a third party complaint against

her husband, David Rively ("Rively"), claiming he diverted funds and property as well.

Presently before the court is (1) Chapter 83's partial motion to dismiss (99–440–GMS, D.I.38)[3] and (2) Choe–Rively and Rively's motion for partial summary judgment (D.I.80). The court will deny Chapter 83's motion to dismiss and strike as untimely Choe–Rively and Rively's motion for summary judgment. The court will also explain its reasoning for its previous grant of the VVA Defendants' motion for summary judgment (D.I.92).

## II. STANDARD OF REVIEW

As an initial matter, Chapter 83 filed a "motion to dismiss" but did not articulate a standard of review. In contrast, Choe–Rively asserts that since she submitted an affidavit with her answering brief (99–440–GMS, D.I.45), the court must apply the summary judgment standard. Although Chapter 83 did not cite to anything outside of the pleadings in its motion, the court believes it must examine the motion as one for summary judgment rather than a motion to dismiss since (1) it will consider Choe–Rively's affidavit and (2) statute of limitations issues are more appropriately considered under such a framework.[4]

---

1. In her first complaint, the plaintiff was identified as Susan Rively. In the second complaint, she was identified as Ensug Choe–Rively. Although the parties refer to the plaintiff differently in their submissions, the court will use Ensug Choe–Rively throughout this memorandum opinion since it appears this is the plaintiff's preferred name and it will distinguish her from her husband.

2. All docket items in 99–336–GMS will be referred to as "D.I.__" whereas docket items filed before the cases were consolidated will be referred to as "99–430–GMS, D.I. __".

3. Although the motion to dismiss purports to dispose of the case, it does not address all the

claims against Chapter 83. The court notes that Webb, Sugzdinis, and Baker did not file any dispositive motions in this case.

4. Chapter 83 may not complain about a lack of notice. First, Choe–Rively stated the motion should be considered one for summary judgment and Chapter 83 did not contest this assertion. Second, the court has given both parties more than ample time to submit additional materials in support of their respective motions. Third, using the summary judgment standard rather than the motion to dismiss standard is more favorable to Chapter 83; the court need not accept all the allegations in the complaint as true. Fourth, the case law cited

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if a reasonable jury could return a verdict for the plaintiff given the evidence. *See Blizzard v. Hastings*, 886 F.Supp. 405, 408 (D.Del.1995). An issue is "material" only if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's*, 193 F.3d 766, 772 (3d Cir.1999). The nonmoving party, however, must demonstrate the existence of a material fact by supplying sufficient evidence—not mere allegations—for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir.1996) (citation omitted). In so doing, the nonmovant's evidence must be sufficient for a reasonable jury to find in its favor, given the applicable burden of proof. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994).

## III. BACKGROUND

Since 1973, the VVA has operated as a not-for-profit New York corporation with its only offices located in Washington, D.C. The mission of the VVA is to provide assistance to Vietnam-era veterans.[5] The VVA is governed by an elected board of directors and has an Executive Director and a staff of approximately 25 people. All these people work in the VVA's Washington, D.C. office.

The VVA acts as a loose umbrella organization with 43 State Counsels and several hundred Local Chapters. Each state counsel and local chapter is a separate corporation with a separate board of directors and its own by-laws. Chapter 83 is one such local chapter.[6] None of the VVA employees or non-VVA employee board members sit on Chapter 83's board. The VVA does not provide money to Chapter 83; the Delaware General Assembly awards it a yearly grant.[7]

by both parties applies the summary judgment standard. *See, e.g., Cuffy v. Getty Refining & Marketing Co.*, 648 F.Supp. 802, 807 (D.Del.1986).

5. The stated purposes of the VVA include (1) eliminating discrimination against Vietnam-era veterans, (2) studying proposed legislation, rules, and regulations impacting Vietnam-era veterans, (3) publishing research on, inter alia, the relationship between Vietnam-era veterans and American society and (4) helping improve the condition of Vietnam-era veterans.

6. Delaware does not have a state counsel. Chapter 83 is the only local chapter in the state.

7. There is a bit of a dispute on this issue. Although it is uncontested that the Delaware General Assembly provides grants to Chapter 83, the parties have differing interpretations on the relationship between the VVA and the General Assembly. The VVA offers an affidavit by Richard A Givens III, a Senior Fiscal Administrative Officer in the State Treasurer's Office for the State of Delaware. Mr. Givens' affidavit states that the General Assembly gives money directly to Chapter 83 and does not need the VVA's permission to do so. Choe–Rively counters with an affidavit from Garry Gaulker, a Senior Fiscal Administrative Officer in the Controller General's Office of the State of Delaware. Mr. Gaulker's affidavit avers that in the spring of 1997, he became aware of "improper conduct and/or difficulties" with Chapter 83. Accordingly, he withheld a grant to Chapter 83 until the VVA assured him "that a Service Representative was in place to properly utilize the funds."

Although the extent of the relationship of the VVA and Chapter 83 is the subject of some dispute between the parties, the record reveals that as a matter of course the VVA does not (1) approve the hiring, firing, and discipline of Chapter 83 employees, (2) pay their salary or approve raises, (3) determine their vacation or sick leave, (4) control the office environment, (5) supervise daily performance,[8] (6) set hours working hours or (7) otherwise control their actions.

Instead, the VVA's connection to Chapter 83 provides a means for Chapter 83 employees to gain certification to represent veterans before the United States Department of Veterans Affairs (the "VA"). The VA has certified the VVA as one of a number of organizations which are allowed to accredit Service Representatives who represent veterans claiming benefits from the VA. The requirements for being an accredited Service Representative are (1) successfully completing an approved course of instruction, (2) passing a test, (3) being able to represent claimants and (4) being recommended by a sponsoring organization. Service Representatives are not required to be employees of the accrediting organization. At the time of the events at issue in the case, William Russo, Esq. was the VVA's Director of Veteran Benefits in charge of the VVA's accrediting and training process.

VA regulations require all organizations who accredit Service Representatives to "take affirmative action, including training and monitoring of its accredited representatives, to ensure proper handling of claims." *See* 38 C.F.R. § 14.628(d)(5). To this end, the VVA has published a document titled the "Veterans Benefits Program Policies" which sets forth guidelines for Service Representatives it trains and certifies. Among the policies are:

> VVA Service Representatives and Chapter Service Coordinators, without regard to their source of income, are considered to be under the operational control of the VVA Director, Veterans Benefits Program in regard to all VVA veterans benefits representation.

To further comply with the VA's requirements, the VVA maintains a file on each Service Representative which contains information regarding the Service Representative's training, certification, and quarterly reports of veterans represented. Finally, Service Representatives are required to adhere to standards of professional conduct established by the VVA. Failure to do so may be grounds for the VVA's revocation of a Service Representative's accreditation.[9]

At the time of the suit, there were approximately 375 Service Representatives

---

*See infra,* note 16 for a discussion on how Gaulker's affidavit does not change the court's analysis of the relationship between Choe–Rively and Chapter 83.

8. Again, the parties dispute this issue as it relates to Choe–Rively. Although Russo spoke to Choe–Rively in the summer of 1997, the VVA states that it was at the request of Chapter 83 and that they only acted as a mediator between the parties. Choe–Rively suggests that this intervention proves that the VVA asserted control over her daily operations. *See infra* for a more detailed discussion.

9. Choe–Rively points to several other sections of the Veterans Benefits Program Policies. All of the sections should properly be characterized as responsive to the VA's mandate in 38 C.F.R. § 14.628(d)(5) to ensure that Service Representatives the VVA accredits follow certain guidelines. Aside from including the Veterans Benefits Program Policies in the record, Choe–Rively offers no evidence to suggest that these policies are not merely to further 38 C.F.R. § 14.628(d)(5).

in 35 states to assist veterans with VA benefits claims. Choe–Rively was one such Service Representative. She was trained in 1993 by a private company who, at the time, contracted with the VVA to manage their Service Representative program. At the time Choe–Rively began her training, she indicated that she was an employee of Chapter 83. Upon the completion of her training, the VA accredited Choe–Rively, subject to its guidelines, in 1994. Once Choe–Rively was accredited, she began representing veterans from the regional VA office. Her position as a Service Representative was funded via a State of Delaware grant to Chapter 83. The record indicates that Choe–Rively was not on the VVA's payroll (she neither received a W–2 nor had the VVA paid any taxes on her behalf) and did not receive any benefits from the VVA (including worker's compensation or payment of unemployment benefits).[10]

Prior to the spring of 1997, the relationship between Choe–Rively, Chapter 83, and the VVA was similar to that of all Service Representatives. Her contact with Russo was more in the nature of answering questions and providing advice about specific cases and problems. Russo, as the supervisor of all Service Representatives accredited by the VVA, did not have regular contact with Choe–Rively. According to his affidavit, Russo had neither the time, nor the manpower to supervise all the Service Representatives on a regular basis.

During the spring of 1997, Chapter 83 held an election for its officers. Although Rively had been the president of Chapter 83, he was not reelected at that time. Rively contacted Russo in May, 1997

claiming that racist statements were made at the election and that Chapter 83 was now controlled by a racist motorcycle gang—the Vietnam Veterans Motorcycle Club of Delaware (the "VVMCD"). Choe–Rively and Rively went to Washington, D.C. and met with Russo and Calvin Gross, a member of the VVA's board. As a result of the meeting, Gross looked into the allegations. At that time, there was no change in Choe–Rively's relationship as a Service Representative with either the VVA or Chapter 83.

Gross decided to address the allegations at a regional meeting of the presidents of the VVA state counsels from New York, New Jersey, and Pennsylvania. Before the meeting, Gross called Sugzdinis, the newly elected Chapter 83 president, and asked him to attend. He also spoke with Rively and the members of the VVMCD about what exactly had transpired at the Chapter 83 election. At the regional meeting, held in Valley Forge, Pennsylvania, Gross and the other state council presidents met with Sugzdinis, Baker, and Webb. The Chapter 83 representatives admitted that racist and offensive statements were made at the election, held at the VVMCD. It is unclear if the statements in question were made by members of Chapter 83, the VVMCD, or both.

After admonishing Sugzdinis, Baker, and Webb and discussing what was to be done, the meeting turned to concerns the three men had prior to their taking office. In a nutshell, these concerns revolved around alleged financial discrepancies during Rively's tenure as president of Chapter 83 and Choe–Rively keeping irregular office hours.[11]

---

**10.** Additionally, when Choe–Rively applied for unemployment compensation, the Delaware proceedings were between her and Chapter 83 only.

**11.** Although the parties spend much time discussing the allegations surrounding alleged financial irregularities, the details are not relevant for resolving the instant motions. Sim-

Subsequent to the Valley Forge meeting, Gross spoke with Choe–Rively and Rively regarding the allegations. Specifically, he asked Choe–Rively about her hours and she responded that since she just had a baby it was difficult for her to keep a regular schedule. On June 19, 1997, Choe–Rively sent a fax to the VVA, Chapter 83, and the VA that she was "on emergency medical leave until **further** notice" (emphasis in original).

Upon receiving notice of Choe–Rively's actions, Gross went to her office at the local VA to determine the status of the files she kept as a Service Representative. Since Choe–Rively was the only Service Representative in Delaware and her return date was unclear, Russo, Gross, Sugzdinis and Baker discussed having someone else attend Service Representative training. Baker later sent Russo an application and attended Service Representative training, conducted by the VVA and the National Association of County Veterans Officers, in July, 1997. Baker was accredited by the VA as a Service Representative on August 27, 1997.

During the summer of 1997, Choe–Rively contacted Russo several times. First, she asked him to tell the Chapter 83 officials "to stop questioning her regarding previous allegedly [sic] unauthorized expenditures, and regarding the hours she worked." Russo responded that the matter was between her and Chapter 83 since it, not the VVA, was her employer. Second, on July 22, 1997, Russo received a memorandum addressed to him from Choe–Rively and a copy of a memorandum she sent to Chapter 83.[12] The memorandum indicated that Choe–Rively was feel-ing better and was capable of returning to work. Third, in August, 1997 Russo spoke with Choe–Rively's attorney regarding her working situation. Russo stated at his deposition that he decided to address Choe–Rively's employment status since she was the only Service Representative in Delaware and her absence meant no one was presently representing area veterans before the VA.

After talking with the relevant parties, Russo proposed a "temporary compromise" that allowed Choe–Rively to return to work. In the letter Russo sent to Choe–Rively regarding the agreement he brokered, he stated:

> I have no authority to make commitments on behalf of Chapter 83 regarding the future of your work for them. I am taking this action to help assure that the disabled veterans and their families you represented do not suffer because the VVA office at the VARO [Veterans' Affairs Regional Office] is being left unattended.

Several weeks after sending Choe–Rively the letter, Russo received a copy of a memorandum from Chapter 83 to Choe–Rively for her alleged insubordination and poor ethical behavior.

Toward the end of August, 1997, Choe–Rively informed Russo that she was resigning as Chapter 83's Service Representative. Choe–Rively appeared willing to work until a replacement could be found. After talking with Sugzdinis and determining the date Baker, who was recently certified, could start working, Russo sent Choe–Rively a letter telling her Chapter

---

ply put, the dispute continued throughout the period in question and gradually escalated.

**12.** The Chapter 83 memorandum also included a charge by Choe–Rively against Chapter 83 filed on May 20, 1997 with the Equal Employment Opportunity Commission (EEOC). Sugzdinis called Russo regarding the EEOC charge but Russo did not suggest a course of action regarding Choe–Rively's employment status.

83 wanted her resignation to be effective September 5, 1997. After Choe–Rively left Chapter 83,[13] the VVA asked the VA to revoke her accreditation as a Service Representative. The VA subsequently canceled her accreditation.

Finally, in August, 1998, Chapter 83 sent Russo a recently received copy of the EEOC charge Choe–Rively filed against it.[14] Both the VVA and Chapter 83 responded to the charge, although Choe–Rively only listed Chapter 83 as her employer and only Chapter 83 received the charge.

Choe–Rively filed her first suit with the court on May 29, 1999.

## IV. DISCUSSION

First, the court will discuss its reasoning for entering summary judgment in favor of the VVA Defendants. Second, the court will analyze Chapter 83's motion to dismiss. Finally, the court will address Choe–Rively and Rively's motion for summary judgment on the counter claims.

### 1. The VVA Defendants' Motion for Summary Judgment

### a. The Relationship Between the VVA and Choe–Rively

■ In order to bring suit against the VVA under Title VII and the Fair Labor Standards Act, Choe–Rively must first demonstrate that the VVA is, in fact, her employer. *See Lyes v. City of Riviera Beach, Fla.,* 166 F.3d 1332, 1341 (11th Cir.1999) (finding that determining existence of employment relationship is threshold question in Title VII cases); 29 U.S.C. § 216(b) (stating that "any *employer* who violates [relevant code sections] shall be liable to *employee* ) (emphasis added). Choe–Rively asserts that the VVA and Chapter 83 were her joint employers".[15] In determining whether an entity is a co-employer for purposes of Title VII, the court looks to the "level of control an organization asserts over an individual's access to employment and the organization's power to deny such access". *See Graves v. Lowery,* 117 F.3d 723, 728 (3d Cir.1997) (citing cases).

■ There is no magic formula for determining whether an organization is a joint employer. Rather, the court must analyze "myriad facts surrounding the employment relationship in question." *See id.,* at 729. No one factor is decisive. *See id.,* at 728. However, the control an organization asserts must be "significant," *id.,* at 727, and there must be a "sufficient indicia of an interrelationship . . . to justify the belief on the part of an aggrieved employee that the [alleged co-employer] is jointly responsible for the acts of the immediate employer." *See id.,* at 728 (quoting *Armbruster v. Quinn,* 711 F.2d 1332, 1337 (6th Cir.1983)).

---

13. Although Choe–Rively submitted a letter of resignation, she claims she was constructively discharged. As demonstrated below, this dispute is immaterial to the court's disposition of the issues regarding the VVA Defendants.

14. *See supra,* note 12. Although Choe–Rively filed the charge on May 20, 1997, the EEOC did not send it to Chapter 83 until August, 1998. The EEOC never sent the VVA a copy of Choe–Rively's charge.

15. The single employer and the agency theory are two other ways the courts have analyzed the employer/employee relationship. Choe–Rively's papers arguably allude to the single employer theory. Although the tests are slightly different, the central concern is the extent to which an entity is able to exert control over an employee and the relationship between them. Since the court finds that the VVA did not exert anything more than a general monitoring function over Choe–Rively in accordance with VA guidelines, the VVA cannot be considered an employer under any test.

As an initial matter, it is beyond dispute that, as far as Choe–Rively was concerned, the VVA did not (1) provide Chapter 83 with funding for her salary,[16] (2) hire her or participate in Chapter 83's hiring her,[17] (3) determine her compensation arrangement, (4) provide her with any employee benefits, (5) approve or determine her sick leave, medical leave, or vacations, (6) pay unemployment insurance on her behalf, (7) offer her workman's compensation or (8) discipline her. Furthermore, the record demonstrates that the VVA and Chapter 83 are separately incorporated, have completely different boards of directors, and have their own by-laws.

The heart of Choe–Rively's theory is that since the VVA "holds the life of Mrs. [Choe–] Rively as a 'Service Representative' in its hands, and can hire and fire her, by accrediting her and revoking her accreditation, maintain operational control over her, require quarterly reports from her, they are under normal circumstances her[ ] minimally [sic] 'joint employer' ...." According to Choe–Rively, the VVA's charge from the VA to "take affirmative action, including training and monitoring of its accredited representatives, to ensure proper handling of claims" transforms the relationship between her and the VVA into one of employer-employee. Therefore, Choe–Rively asserts, the VVA is a proper party to sue under Title VII and the Fair Labor Standards Act.[18]

The problem with this syllogism is twofold; it both assumes too much and it does not comport with the facts. First, the ability of the VVA to decertify Choe–Rively does not mean that it had the power to terminate her position with Chapter 83.[19] The VVA was not the only organization who trained Service Representatives; Choe–Rively could still continue to work for Chapter 83 as a Service Representative upon undergoing training by another enti-

**16.** As mentioned above, Choe–Rively seeks support for her 'financial link' argument in an affidavit from Mr. Gaulker. The court considered the affidavit in its analysis and finds that it does not create a genuine issue of material fact on this issue. First, it is uncontroverted that the grants from the General Assembly came from the coffers of the State of Delaware rather than the VVA. Second, Gaulker, not the VVA, decided whether or not to issue the grants. There is no suggestion that the VVA had any authority to tell Gaulker not to give Chapter 83 a grant. On the contrary, the affidavit states "[u]pon my instruction ... the Treasurer's office withheld payment until I was assured by the ... [VVA] that a Service Representative was in place...." Third, the affidavit only covers a limited time frame and does not describe the grant process to Chapter 83 generally. Fourth, the court could well strike the affidavit as untimely. See infra note 31. Upon examining the 'myriad' factors surrounding any economic link between the VVA and Chapter 83, the court finds that they are not sufficient to establish an employer-employee relationship with Choe–Rively. See supra, note 7.

**17.** It appears that Choe–Rively was an employee of Chapter 83 before she applied for Service Representative accreditation. At minimum, she has not demonstrated that the VVA participated in any way in hiring her to work for Chapter 83.

**18.** In Count I of her complaint in 99–430–GMS, Choe–Rively claims the VVA also violated § 1981 by intentionally discriminating against her "in employment". Although the parties do not spend much time discussing whether Choe–Rively can properly allege § 1981 if the VVA is not found to be her employer, the court considers this question beyond dispute—if the VVA cannot be considered Choe–Rively's employer, it must follow that it cannot discriminate against her "in employment." Therefore, the court will consider the VVA's status as a precondition to Choe–Rively being able to successfully assert a § 1981 claim against it.

**19.** The record shows that Choe–Rively worked for Chapter 83 (albeit on a voluntary basis) prior to being trained as a Service Representative. See supra, note 17.

ty.[20] In light of the VA mandate, the VVA merely set in place a system to ensure Service Representatives complied with various requirements.[21] Although Chapter 83 may consider compliance with the VVA's policies to be an essential *condition* of employment, there is nothing in the record to suggest that failure to follow the VVA policies would result in Choe–Rively's *automatic* termination from the employ of Chapter 83.

The record demonstrates that the VVA, through Russo and Gross, only became involved in the situation at the behest of Chapter 83. Even then, Russo repeatedly informed Choe–Rively that he was merely acting as a mediator and was relaying the instructions and wishes of Chapter 83. Although it is true that Russo became involved in Choe–Rively's daily routine (again at Chapter 83's request), he claims that he *did so out of a concern for* ensuring a continuity in representation of veterans claiming benefits from the VA. Choe–Rively has not offered any record evidence to contest this claim. Finally, the denouement of Choe–Rively's employment further supports the VVA's position. To argue that the VVA effectively fired her by revoking her accreditation is the tail wagging the dog; the VVA asked the VA to terminate her accreditation only *after* she left Chapter 83's employment.

The case law supports the court's reasoning. Courts have been reluctant to find that a not-for-profit organization is a co-employer with a parent organization in situations where the two entities are even more related than the VVA and Chapter 83. *See, e.g., Walker v. Boys and Girls Club of Amer.,* 38 F.Supp.2d 1326, 1331–36 (M.D.Ala.1999) (declining to find national entity fit within Title VII definition of employer since plaintiff failed to demonstrate centralized or active control despite publication by national organization of job vacancies, job descriptions, and performance review charts and national entity providing pension benefits and insurance); *Tatum v. Everhart,* 954 F.Supp. 225, 228–29 (D.Kan.1997) (holding that private not-for-profit corporation and member organization cannot be considered an employer for purposes of Title VII even though local organization was required to pay dues and satisfy other requirements since, inter alia, they were separately incorporated and had different by-laws); *Hall v. Del. Council on Crime and Justice,* 780 F.Supp. 241, 245 (D.Del.1992) (finding that funding of not-for-profit corporation by another not-for-profit organization does not mean two are 'single employers' for purposes of Title VII); *Webb v. Amer. Red Cross,* 652 F.Supp. 917, 919–22 (D.Neb.1986) (holding that local chapter and national organizations are not 'joint employers' despite fact that chapter sends national organization reports, adheres to guidelines, has national organization train and certify its instructors since personnel policies are adopted by the local organization (including wages, termination, and hiring), by-laws are separate and financial affairs are not related).

In light of the multiple factor analysis for determining the existence of an em-

---

**20.** Choe–Rively does not appear to contest this point.

**21.** Choe–Rively makes much of the "operational control" language from the Veterans Benefits Program Policies handbook. This passage cannot be interpreted in a vacuum, however. The beginning of the handbook states that its purpose is to remove the VVA Service Representative activities "from the integral political activities of the organization." Furthermore, the aim of the reporting and oversight responsibilities is to ensure the Service Representatives act "lawfully, professionally, and ethically" rather than attempting to exert control over their individual decisions in specific cases.

ployer-employee relationship, the court concludes that the VVA cannot be considered Choe–Rively's employer. At the bottom, Choe–Rively's claim is that the VVA should be held to be an employer merely for training and establishing minimum requirements for active certification. The problem with this logic, however, is that in light of all the other factors, a reasonable jury could not conclude that the VVA was her co-employer. Since Choe–Rively cannot, as a matter of law, pursue her claims under Title VII, the Fair Labor Standards Act, or § 1981 the court entered summary judgment in favor of the VVA on all claims against it (D.I.92).

### b. Choe–Rively's Claims Against Russo and Gross Under 42 U.S.C. §§ 1981 and 1985(3)

In Counts VIII and IX of the complaint filed in 99–430–GMS, Choe–Rively alleges that "the acts and practices" of Russo and Gross constituted a conspiracy under 42 U.S.C. § 1985(3) to deprive her of her rights guaranteed by 42 U.S.C. § 1981.[22] Since § 1985(3) does not create any substantive rights, it is beyond question that if Choe–Rively's § 1981 claim fails, her § 1985(3) claim must fail as well. *See Great Amer. Sav. and Loan Assn. v. Novotny*, 442 U.S. 366, 376, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) (stating that since § 1985(3) is purely remedial, it only provides civil cause of action when based on "some otherwise defined federal right"). Although the briefing on this issue is thin,

the court concludes that there are no genuine issues of material fact and that Choe–Rively cannot, as a matter of law, succeed on her § 1981 claim.[23]

The court must analyze claims under § 1981 using the familiar burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Jones v. Sch. Dist. of Philadelphia.*, 198 F.3d 403, 410 (3d Cir.1999); *Stewart v. Rutgers, The State University*, 120 F.3d 426, 431 (3d Cir.1997). The *McDonnell Douglas* framework proceeds in three steps. First, Choe–Rively must establish a prima facie case by a preponderance of the evidence. If Choe–Rively can establish a prima facie case, the burden shifts to Russo and Gross 'to articulate some legitimate, nondiscriminatory reason' for their actions. Third, should Russo and Gross be able to meet their burden, Choe–Rively must show, by a preponderance of the evidence, that the reasons Russo and Gross offered were merely a pretext for race discrimination. *See Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citations omitted). Although the burdens shift, it is important to understand that "[t]he ultimate burden of persuading the trier of fact that the defendants intentionally discriminated against the plaintiff remains at all times with the plaintiff." *See id.* The court will address the parties' respective burdens in turn.

---

**22.** Although Choe–Rively originally claimed the Fourteenth Amendment as the substantive basis of the conspiracy charge, she amended her complaint to allege a violation of § 1981 after admitting that the Fourteenth Amendment could not be asserted for § 1985(3) violations. The Third Circuit has never addressed whether § 1981 can be used as the basis for a § 1985(3) conspiracy. The court declines to reach this constitutional question

since the issue has not been properly raised by the parties.

**23.** Since the VVA cannot be considered Choe–Rively's employer, she cannot bring a § 1981 claim against it. Nevertheless, the following analysis applies to the VVA as well. Even if the VVA could be considered Choe–Rively's employer, her claim under § 1981 would fail as a matter of law.

The elements of § 1981 are largely governed by the facts of the case; there is no "one-size fits-all" approach. *See Jones,* 198 F.3d at 411 (citing cases). According to the facts presented to the court, Choe–Rively needs to show the following facts to make a prima facie case. First, that she is Asian. Second, that Russo and Gross intended to discriminate against her on the basis of her race. Third, that Gross and Russo interfered with her ability to make an employment contract with Chapter 83. Although Choe–Rively can establish the first element of her prima facie case (it is undisputed that she is Asian since she is of Korean ancestry), she has not met her burden in demonstrating, to a preponderance of the evidence, the second and third elements of her prima facie case.

The record reveals the following facts. During the Valley Forge meeting, Gross learned that racist and sexist statements had been made at the Chapter 83 election, "admonished" Sugzdinis, Baker, and Webb, and discussed actions to be taken. Also at the Valley Forge meeting, Sugzdinis, Baker, and Webb voiced concerns to Gross regarding Choe–Rively's ability to act as a Service Representative. Subsequent to the Valley Forge meeting, Gross told Russo about Sugzdinis, Baker, and Webb's concerns. Throughout the spring and summer of 1997, Chapter 83 and Choe–Rively had disputes about her employment status. Russo acted as a broker between Chapter 83 and Choe–Rively in their employment dispute. After Choe–Rively took a medical leave of absence, Gross, Russo, and several members of Chapter 83 discussed having Baker becom-

ing trained and certified as a Service Representative When Choe–Rively left Chapter 83's employ, Russo instructed the VA to terminate her accreditation.

There is absolutely no evidence to suggest that Gross intended to discriminate against Choe–Rively on the basis of her race or that he interfered with her employment. Contrary to Choe–Rively's assertions, the evidence shows that Gross' actions regarding her role as a Service Representative were separate from the incident at the Chapter 83 election. After being informed that racist and sexist comments were made at the Chapter 83 election, Gross "admonished" Sugzdinis, Baker, and Webb and discussed with them what was to be done. According to Gross' affidavit, the conversation regarding Sugzdinis, Baker, and Webb's "concerns" regarding Choe–Rively's office hours was entirely separate from the first discussion.[24] Choe–Rively' suggestion that Gross' presence at the meeting means that all his subsequent actions arose from an intent to discriminate is conclusory at best; she offers no evidence that his telling Russo "what the situation was with the ... Service Representative" arose from a discriminatory motive. On the contrary, Gross asserts that he merely told Russo about Sugzdinis, Baker, and Webb's concerns regarding Choe–Rively's ability to fulfill her duties as a Service Representative. Since Choe–Rively has not presented any evidence—beyond mere assertions—to show that Gross' actions regarding her position as a Service Representative were in any way linked to his discussing the Chapter 83 election, Choe–Rively cannot pursue a

24. After describing the discussion of the Chapter 83 election, Gross' affidavit goes on to state "[a]t the Valley Forge meeting, the ... Chapter 83 representatives *also* addressed concerns they had about the Chapter when they took office ... I suggested that establishing regular office hours for ... [Choe–Rively] might help solve that problem." (emphasis added).

claim under § 1981 against him.[25]

■ Although Russo had more involvement with Choe–Rively, there is similarly no evidence that he acted with any discriminatory intent or that he interfered with her ability to make an employment contract with Chapter 83. Indeed, there is even less of a connection between Russo's actions and the Chapter 83 election. Although Gross told Russo about the Valley Forge meeting "since he thought he should know about it," the uncontradicted evidence reveals that Gross did not tell Russo to take specific action. On the contrary, Russo only acted when Choe–Rively informed him that she was taking "emergency medical leave." In his affidavit, he stated "her sudden absence was of concern to me because she was the only accredited VVA Service Representative in Delaware"—there is no indication in the record that he had any discriminatory animus. Russo's actions were merely in response to concerns Sugzdinis raised about Choe–Rively's conduct as a Service Representative and was entirely separate from the dispute between Chapter 83 and Choe–Rively regarding assets and finances.[26] Although Russo spoke with Sugzdinis regarding sending Baker to Service Representative training, he never agreed that Baker should replace Choe–Rively; he stated that the "decision was for . . . Chapter 83 to make". Russo's decision to terminate Choe–Rively's accreditation as a Service Representative was based on standard procedure since it was made only after she left Chapter 83. Since Choe–

Rively offers nothing more than allegations and unsupported speculation that Russo acted with discriminatory animus against her and interfered with her ability to contract with Chapter 83, her § 1981 claim cannot, as a matter of law and fact, proceed against him as well.

■ Even if the court were to find that Choe–Rively could establish a prima facie case of a violation of § 1981, she would still be unable to pursue her claim against Gross and Russo. Under the second step of the *McDonnell Douglas* framework, "the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions." *See Burdine,* 450 U.S. at 260, 101 S.Ct. 1089. As mentioned above, both Gross and Russo stated that since Choe–Rively was the only Service Representative in Delaware, their actions were responsive to concerns raised by Chapter 83. These actions were designed to ensure that area veterans would be able to pursue their claims before the VA. Furthermore, Russo stated in his affidavit that he asked the VA to terminate Choe–Rively's Service Representative accreditation since "[it] was standard procedure after a Service Representative resigned his or her position. I have done the same thing when I have learned that other VVA Service Representatives have left their position." The court finds that Russo and Gross cogently stated nondiscriminatory reasons for their actions.

The burden then shifts back to Choe–Rively. In order to survive the motion for

---

**25.** Choe–Rively similarly offers no evidence to suggest that Gross' discussions regarding Baker becoming a Service Representative were also motivated by racial animus. On the contrary, the record indicates that Gross and Russo's actions regarding Baker were merely to ensure that there was a Service Representative in Delaware to handle veterans' benefit claims. Choe–Rively offers nothing more than speculation to rebut this position.

**26.** Russo states that Choe–Rively called him several times to intercede in the financial dispute between her and Chapter 83. As mentioned above, Russo declined to do so and told Choe–Rively that the VVA was not her employer.

summary judgment, she must present sufficient evidence "to raise a genuine issue of material fact as to whether [Gross and Russo's] proffered reasons were not [their] true reasons for the challenged ... action". *See Stewart*, 120 F.3d at 433; *see also Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994) (stating that "to defeat summary judgment where the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a reasonable factfinder could reasonably either (1) disbelieve the ... articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of ... the action.").

The only evidence Choe–Rively offers is that Russo and Gross did not respond to her request to appeal the denial of her certification as a Service Representative. According to her, this omission calls into question Russo and Gross' proffered reasons for all their actions. The record, however, does not support her claim. In his supplemental declaration, Russo states that he did not act on Choe–Rively's request for a hearing since "cancellation of an accreditation after resignation of a VVA [S]ervice [R]epresentative is not an appealable issue under the VVA policies for the Veterans Benefits Program.... As a matter of practice, when other VVA [S]ervice [R]epresentatives resigned from a spon-

sored position, I did not continue their accreditation." Choe–Rively neither points to specific language in the Veterans Benefits Program documents to contest this procedure, nor offers any evidence to suggest that she was treated differently than other Service Representatives who left or resigned. Choe–Rively has not offered a shred of evidence to suggest Russo and Gross' stated reasons are pretextual or the result of a mixed motive.[27] Therefore, even if she were to establish a prima facie case, she cannot sustain her ultimate burden under § 1981.

## 2. Chapter 83's Motion to Dismiss

■ As stated above, the court will treat Chapter 83's motion to dismiss as one for summary judgment. Chapter 83 argues that since Choe–Rively failed to file a claim under § 1981 against it within the applicable statute of limitations, the claim must be dismissed.

■ The parties agree that claims under § 1981 are governed by the two year Delaware state statute of limitations for personal injuries. *See Cuffy*, 648 F.Supp. at 802 (citing *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir.1985)); *see also* 10 Del.C. § 8119. Since Choe–Rively filed her § 1981 claim on July 7, 1999, the relevant date for the court is July 7, 1997. If the court finds that Choe–Rively alleges injury due to Chapter 83's employment discrimination after July 7,

---

**27.** Choe–Rively is incorrect that since the court cannot weigh credibility and that any fact is sufficient to meet her ultimate burden. First, the proper standard is whether any *reasonable* jury could find for the nonmovant given disputed *material* evidence. Second, although addressing the directed verdict standard under Fed.R.Civ.P. 50(b) (a higher standard than summary judgment), the Supreme Court stated:

[A defendant is] entitled to judgment as a matter of law if the record *conclusively* revealed some other, nondiscriminatory reason for the [defendant's] decision or if *the plaintiff created only a weak issue of fact* as to whether the [defendant's] reason was untrue and there was abundant and uncontroverted evidence that no discrimination occurred.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (emphasis added).

1997, the complaint is timely filed and Chapter 83's motion must be denied. Under the "continuing violation" theory, Choe–Rively may introduce acts prior to the statute of limitations bar if they are "reasonably related" to an act that falls within the limitations period. *See Cuffy,* 648 F.Supp. at 810.

The court's task is twofold. First, it must ascertain whether Choe–Rively alleged any acts subsequent to July 7, 1997 that constituted adverse employment actions. Second, it must determine whether those acts are "reasonably related" to acts prior to July 7, 1997. Bearing in mind that, at this stage of the proceedings, the court must construe the record in a light most favorable to Choe–Rively and resolve all inferences (and ambiguities) in her favor, the court finds that a reasonable jury could determine that Choe–Rively's allegations constitute "negative employment" actions within the applicable period and that they could "reasonably relate" to prior actions. *See, e.g., West v. Phila. Elec. Co.,* 45 F.3d 744, 754 (3d Cir.1995) (stating that so long as plaintiff claims 'at least one' act within the limitations period, plaintiff may prove violation of § 1981 by relying on discriminatory acts outside limitations period if they constitute a pattern of discriminatory behavior).

Upon examining both the evidence in record and Choe–Rively's complaint, the court finds that she has alleged incidents that occurred subsequent to July 7, 1997, a jury could reasonably conclude constitute adverse employment actions. First, Choe–Rively claims that on or before July 18, 1997, the defendants discontinued her "essential job required pager, without notice, so as to render her job performance ineffective." Second, she avers that after August 4, 1997,[28] Sugzdinis "began a campaign of abuse and harassment in retaliation" against her for complaining about racist and sexist comments by (1) telling her that she had to report "all her movements, at all times ... including when she went to the bathroom" and (2) "continually" faxing her memos at the VA which accused her of not working, despite being told by the VA not to use government fax machines for personal reasons. Third, Choe–Rively states in her affidavit that in August, 1997 she was "honored" with an invitation to attend a retirement ceremony in Quantico, Virginia but that Chapter 83 prevented her from attending. Fourth, Choe–Rively asserts that she was "not paid for her services" for over three months prior to August 27, 1997. At this stage in the case, it is not for the court to judge the severity of these "adverse" employment actions.[29] Rather, it is sufficient to note that they all occurred after July 7, 1999.

Since the court identified several possible "adverse employment actions" which occurred within the statute of limitations,

---

**28.** Choe–Rively apparently returned to work in the beginning of August, 1997, since her doctor "cleared" her for work. As mentioned above, Choe–Rively took a leave of absence for medical reasons that sprang from alleged racial epithets made against her.

**29.** The court also notes that Choe–Rively's affidavit contains an undated incident in which Webb told her that the members of Chapter 83 "were trying to force [her] out because she was a 'f____ gook', because the members did not need a 'gook' representing the 'brothers' who served in Vietnam." Chapter 83 makes much of the fact that this incident is undated, suggesting that it could have occurred prior to July 7, 1999. However, the court must construe the record in the light most favorable to Choe–Rively. Given that the affidavit is an attempt to provide evidence to overcome Chapter 83's motion and the chronological character of the affidavit, the court cannot say that a reasonable jury would be unable to conclude the incident was after to July 7, 1997.

it must next consider whether they "reasonably relate" to prior discriminatory acts. Although Choe–Rively does not specify exact times and places, she alleges that on several occasions the members of Chapter 83 used racist or sexist comments to refer to her. By stating that there was a "campaign" against her, Choe–Rively has at least asserted that the past discrimination was not limited to "isolated instances." For example, it is uncontested that Choe–Rively was subject to racist and sexist comments at the Chapter 83 election. She claims that the meeting was merely the beginning of a pattern of racist comments made by Chapter 83 members that ended when she left Chapter 83 at the end of August, 1997. Given that the events of the Chapter 83 election are uncontested and that the subject matter of the allegations by Choe–Rively is the same, the court concludes that a reasonable jury could find that there was a continuing course of conduct.

For the aforementioned reasons, the court is compelled to deny Chapter 83's motion on statute of limitation grounds. First, Choe–Rively has identified what could be construed as "adverse employment actions" within the statute of limitations period. Second, she has produced a 'mere scintilla' of evidence to suggest that Chapter 83 engaged in a pattern of discriminatory conduct in violation of § 1981. Although the record is sparse, the court is unwilling to deny Choe–Rively her opportunity to present her case to a jury.

### 3. Choe–Rively and Rively's Motion for Summary Judgment

█ On July 15, 1999, Chapter 83 filed an answer and counterclaim against Choe–Rively, alleging common law fraud and conversion. On January 14, 2000, Chapter 83 filed a third party complaint against Rively. Under the original scheduling order in this case, the deadline for discovery was December 29, 2000, and the dispositive motion deadline was January 12, 2001. Chapter 83 filed its motion to dismiss on February 4, 2000 and the VVA Defendants filed their motion for summary February 10, 2000. In response to the VVA Defendants' motion to dismiss, Choe–Rively filed an affidavit pursuant to Fed.R.Civ.P. 56(f) requesting time to conduct additional discovery on the issue of the relationship between her and the VVA. The affidavit did not mention any need to conduct more discovery regarding the cross-claim or the third party claim.

The court conducted a teleconference on December 1, 2000, at which the parties addressed Choe–Rively's request for additional discovery to respond to the VVA Defendants' motion for summary judgment. At the teleconference, Choe–Rively's counsel stated that he wanted to depose several individuals who could provide relevant information responsive to the VVA Defendants' motion. On the basis of the representations of Choe–Rively's counsel, the court agreed to extend the discovery and dispositive motion deadlines in the case until January 19 and January 31, 2001, respectively. There was no mention at the teleconference of any cross motion for summary judgment by Choe–Rively. Indeed, the parties did not even discuss the existence of counterclaims in this case or even mention the presence of Rively as a third party defendant. At the conclusion of the teleconference, the court was left with the impression that the parties would conduct discovery for the purpose of allowing Choe–Rively to better answer the VVA Defendants' pending motion.

Choe–Rively and Rively filed their summary judgment motion on January 31, 2001—more than a year after the filing of the third party complaint and approximately a year and a half after the filing of

the cross-claim. Both Rively and Choe–Rively's motions are untimely. Rively's motion rests on a statute of limitations defense; it does not rely on any meaningful discovery in the case. Rively could have filed his motion for summary judgment well in advance of the original dispositive motion deadline in this case. Furthermore, there is no reason why Rively's counsel could not have informed the court of an impending motion on statute of limitations grounds. As for Choe–Rively's motion, other than two deposition transcripts, there is no indication that the material on which she relies was gleaned during the discovery extension.[30] Although Choe–Rively included deposition testimony taken in January, 2001, in her summary judgment motion, the discovery extension was not intended to allow her to gather facts to file her own dispositive motion. Indeed, Choe–Rively's counsel admitted as much when he requested leave to file a supplemental brief in response to the VVA's motion for summary judgment. In his letter to the court he stated, "[a]t the close of discovery, I had expected the National organization [the VVA] to file a renewed motion for summary judgment utilizing matters brought up in discovery...." After seeking leave of the court, Choe–Rively filed a supplemental reply brief on February 26, 2001.[31]

In light of the court's indulgence of Choe–Rively's focused Rule 56(f) affidavit requesting more discovery on the issues in the VVA's summary judgment motion, it is unfair to allow her to transform the altered schedule into an opportunity to raise new issues at this stage in the case. Choe–Rively will have more than ample opportunity (at trial and beyond) to raise the arguments mentioned in her motion.

## V. CONCLUSION

As explained above, the court granted summary judgment in favor of the VVA Defendants since there are no issues of material fact to suggest that the VVA was Choe–Rively's co-employer and she cannot, as a matter of law and fact, claim that Russo and Gross violated §§ 1981 and 1985(3). Additionally, the court finds that, construing the record in the light most favorable to Choe–Rively, a reasonable jury could conclude that her § 1981 claim against Chapter 83 was timely filed. Finally, since the court determines that Choe–Rively and Rively abused the court's extension of the discovery and the dispositive motion deadlines, the court will strike their summary judgment motions. The court will issue an appropriate order in conjunction with this memorandum opinion.

---

30. On the contrary, some of the evidence submitted by Choe–Rively appears to have been available well in advance of the first dispositive motion deadline.

31. Although the court granted Choe–Rively leave to file a supplemental brief, it did *not* give her leave to extend the discovery deadline of January 19, 2001. Mr. Gaulker's affidavit, mentioned above, was sworn on February 5, 2001, well after the discovery cut-off date. There is nothing in the record to excuse this delay. Therefore, not only did Choe–Rively take advantage of the court's good faith extension of the dispositive motion deadline, she also abused the court's grant of leave to file a supplemental brief by trying to enter untimely discovery into the record.